## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **Delshone Thomas and Gwendolyn Cheney,** | |
| **_Plaintiffs,_** | **Civil Action No.** |
| **v.** | |
| **Georgia Department of Community Health; and Frank W. Berry, in his official capacity as Commissioner of the Georgia Department of Community Health,** | **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **_Defendants._** | |

## <u>INTRODUCTION</u>

1.    Plaintiffs Delshone Thomas and Gwendolyn Cheney ("Plaintiffs") are residents of Georgia who receive health insurance through Georgia's Medicaid program ("Georgia Medicaid"). Plaintiffs are transgender women who require gender-confirming surgical care to treat their gender dysphoria.  Yet they are unlawfully denied coverage for such treatments under a longstanding Georgia Medicaid policy, HCFA-PM-91-4, Attachment 3.1-A, p. 1c (the "Exclusion"), which categorically excludes gender-confirming surgeries from Medicaid coverage regardless of medical necessity.

2.    Plaintiffs file this Complaint against the Georgia Department of Community Health ("DCH") and its Commissioner, Frank W. Berry, in his official

capacity (collectively, "Defendants") to challenge the discriminatory Exclusion, as well as Defendants' continuing refusal to cover medically necessary care for transgender Georgia Medicaid recipients pursuant to the Exclusion, as a violation of their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"); and the comparability and availability requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A)-(B).

3.     The Exclusion, which DCH has continuously enforced since 1993, expressly prohibits Georgia Medicaid coverage for "[t]ranssexual surgery." HCFA-PM-91-4, Attachment 3.1-A, p. 1c. Because of this categorical exclusion, Plaintiffs cannot obtain the surgical care prescribed by their treating health care providers to treat their gender dysphoria—the medically recognized condition of distress associated with having a gender identity (the innate, internal sense of one's sex) that is incongruent with the sex one was assigned at birth.

4.     The Exclusion disregards the fact that the medical community recognizes gender-confirming surgeries as appropriate, safe and effective treatment for gender dysphoria.  The Exclusion ignores the serious harms of denying transgender people access to critical and often life-saving care prescribed by their treating health care provider and thereby unlawfully denies medical care to

transgender Georgia Medicaid beneficiaries, including Plaintiffs. Frustratingly, many surgical treatments that are prescribed to treat gender dysphoria are in fact covered by Georgia Medicaid when used to treat non-transgender people for other conditions. In short, Georgia Medicaid is unlawfully discriminating against Ms. Thomas and Ms. Cheney on the basis of their sex and transgender status. Georgia Medicaid's Exclusion incorrectly characterizes their gender-confirming health care needs as "cosmetic" and/or "experimental or investigational," when the medical community recognizes that they are effective treatments for gender dysphoria. In doing so, Defendants are exposing Plaintiffs to significant and avoidable harms to their health and well-being, in violation of the U.S. Constitution and federal law.

## JURISDICTION AND VENUE

5.    The Court has jurisdiction over the claims asserted herein under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

6.    Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983.

7.    Under 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because Defendants reside and are subject to personal jurisdiction in the District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District, and Plaintiff Delshone Thomas resides in the

District. Under (b)(1), venue is proper in the Atlanta Division of the Northern

District of Georgia because all Defendants reside there.

## PARTIES

8.    Plaintiff Delshone Thomas is an adult resident of Riverdale, Georgia.

She has been eligible for and enrolled in Georgia Medicaid at all times material to

this Complaint.

9.    Plaintiff Gwendolyn Cheney is an adult resident of Athens, Georgia.

She has been eligible for and enrolled in Georgia Medicaid at all times material to

this Complaint.

10.    Defendant Berry is sued in his official capacity as Commissioner of

the DCH. As Commissioner, Defendant Berry is the chief administrative officer of

the DCH and is required under statute to "supervise, direct, account for, organize,

plan, administer, and execute the functions vested in the department." O.C.G.A. §

31-2-6. Defendant Berry is a "person" within the meaning of 42 U.S.C. § 1983 and

is, and was, acting under the color of state law at all times relevant to this

Complaint.

11.    Defendant DCH is the Georgia agency charged with the

administration of Georgia Medicaid. DCH's principal offices are located in Atlanta,

Georgia. DCH is a recipient of federal funds from the U.S. Department of Health

and Human Services ("HHS"), including Medicaid funding. Thus, DCH is subject

to the nondiscrimination requirements of Section 1557, which prohibits

discrimination on the basis of sex in any health program or activity that receives

funding from HHS, including Georgia Medicaid.

## FACTS

### Gender Dysphoria and the Accepted Treatment Protocols

12.     At birth, individuals are assigned a sex generally based solely on a

physician's visual assessment of external genitalia.

13.     Sex, however, is multifaceted, and is comprised of a number of

characteristics, including but not limited to chromosomal makeup, gonads,

hormones, genitalia, and gender identity.

14.     Gender identity is a well-established concept in medicine. Gender

identity is every person's innate, internal sense of their sex. Gender identity is

immutable although the precise origins of each person's gender identity are not

fully understood.  Experts agree that gender identity likely results from a

combination of biological, social, cultural, and behavioral factors.

15.     For most individuals, all sex-related physical characteristics are

congruent, and the external organs used to assign sex at birth are an accurate proxy

for the individual's gender identity. For transgender people, that is not the case, and

they have a gender identity that is incongruent from their assigned sex at birth. A transgender woman is a woman who was assigned male at birth but has a female gender identity. A transgender man is a man who was assigned female at birth but has a male gender identity.

16.    Attempting to try to change a transgender person's gender identity to match their sex assigned at birth, a practice often described as "conversion therapy," is now known to be ineffective and to cause profound harm. Such efforts are considered unethical by all of the relevant medical and mental health professional organizations.

17.    Transgender people have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status. However, the incongruence between a transgender person's gender identity and their sex assigned at birth can result in gender dysphoria, a serious medical condition recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th Ed. 2013) ("DSM-5"). The DSM-5 describes gender dysphoria as the "clinically significant distress or impairment in social, occupational, or other important areas of functioning" associated with a marked incongruence between a transgender person's gender identity and assigned sex.

18.    The World Professional Association for Transgender Health ("WPATH") is an international, multidisciplinary, professional association whose mission is to promote evidence-based health care protocols for transgender people. WPATH publishes the Standards of Care, which are widely accepted as best practices for treating gender dysphoria. The Standards of Care are based on the best available science and expert professional consensus, and are recognized by the major medical professional associations as the authoritative protocols for treating gender dysphoria.  These professional associations include the American Medical Association, the American Psychiatric Association, the American Academy of Pediatrics, and the Endocrine Society.  The Endocrine Society also publishes a Clinical Practice Guideline for the treatment of gender dysphoria.

19.    Accepted protocols for the treatment of gender dysphoria may require medical interventions to align a person's body with their gender identity. Such medical interventions, often referred to as "gender-confirming," "gender-affirming" or "transition-related" health care, may include hormone therapy and various surgical procedures that align a transgender individual's sex characteristics with their gender identity.

20.    The WPATH Standards of Care recognize that, like all health care, gender-confirming health care is individualized. The treatment plan for gender

dysphoria is patient-centric and ultimately enables the individual to live all aspects of their life consistent with their gender identity, thereby eliminating the distress associated with gender dysphoria. Gender-confirming health care is well-recognized as effective for the treatment of gender dysphoria.

21.    Untreated, or inadequately treated, gender dysphoria can lead to dire consequences to an individual's health. Symptoms of untreated or inadequately treated gender dysphoria include intense emotional suffering, anxiety, depression, suicidality, and other attendant mental health issues. Individuals with untreated or inadequately treated gender dysphoria may lose the ability to function effectively in the activities of daily living due to resulting mental health complications, as well as discrimination and victimization that have been linked to untreated or inadequately treated gender dysphoria.

22.    Gender dysphoria often intensifies over time. The longer an individual goes without access to adequate treatment for gender dysphoria, the greater the risk of severe harms to the individual's health.

23.    It is recognized in the medical community that the exclusion of gender-confirming health care for transgender people by private and public insurers is detrimental to the health and wellbeing of individuals suffering from gender dysphoria. The American Medical Association, the American Psychological

Association, the American Psychiatrist Association, the American College of Obstetricians and Gynecologists, and other major medical organizations have issued policy statements and guidelines calling for insurance coverage of gender-confirming health care because it is medically recognized, safe, and effective treatment for gender dysphoria. Today, gender-confirming health care is routinely covered by private and public insurers, including the federal Medicare program.

24.    The federal Medicare program has covered gender-confirming health care since 2014. At that time, the Departmental Appeals Board (DAB) for the U.S. Department of Health & Human Services invalidated as unreasonable a National Coverage Determination (NCD), adopted in 1981, that denied Medicare coverage for gender-confirming surgery. Like the State of Georgia's exclusion at issue in this case, the NCD excluded coverage for gender-confirming surgery as "experimental." In reaching its decision invalidating the NCD, the DAB relied upon "medical studies published in the more than 32 years since issuance of the 1981. . . NCD. . . demonstrat[ing] that transsexual surgery is safe and effective and not experimental." The DAB also deferred to the decision of the Centers for Medicare & Medicaid Services (CMS)—the same federal agency that oversees all state Medicaid programs, including Georgia's—not to defend the 1981 NCD excluding coverage or challenge new evidence supporting coverage. Final

decisions of the DAB are considered to be final decisions of the Secretary of HHS. Therefore, as a direct result of the DAB's decision, the NCD is no longer used as a basis for denying Medicare coverage of gender-confirming surgical care, and Medicare now provides coverage for those services based on individualized medical needs.

25.    On May 10, 2021, HHS announced that it will interpret and enforce Section 1557 of the Affordable Care Act to prohibit discrimination based on gender identity on the grounds that it is a form of sex discrimination.  *See* https://www.hhs.gov/about/news/2021/05/10/hhs-announces-prohibition-sex-discrimination-includes-discrimination-basis-sexual-orientation-gender-identity.html (last visited May 18, 2021).

### Federal Medicaid Program

26.    Established in 1965 under Title XIX of the Social Security Act, Medicaid is a joint federal-state program that provides medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396-1396w-5 (the "Medicaid Act"). The central objective of Medicaid is to enable states to furnish medical assistance to persons whose incomes and resources are insufficient to meet the cost of necessary medical services. 42 U.S.C. § 1396-1.

27.     States are not required to participate in the Medicaid program, but all states do.

28.     The Medicaid Act requires each participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of the state's Medicaid program. 42 U.S.C. § 1396a(a)(5).

29.     In addition, each participating state must maintain a comprehensive plan for medical assistance approved by the Secretary of the U.S. Department of Health and Human Services. 42 U.S.C. § 1396a. The plan must describe the state's program and affirm its commitment to comply with the Medicaid Act and its implementing regulations.

30.     The federal government reimburses participating states for a substantial portion of the cost of providing medical assistance through the Medicaid program.

31.     States that participate in the Medicaid program are required to cover certain types of health care services, including in-patient and out-patient hospital services and physician services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d; 42 U.S.C. § 1396-1. In addition, the statute gives states the option to provide other services, including prescription drugs.

32.     Under the Medicaid Act, "the medical assistance made available to any individual … shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i).

33.     In addition, a state "Medicaid agency may not arbitrarily deny or reduce the amount, duration or scope of a required service … to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

34.     Moreover, state Medicaid programs must provide medical assistance "in a manner consistent with … the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

## **Georgia Medicaid**

35.     The State of Georgia participates in the federal Medicaid program.

36.     DCH is the state agency that administers the Georgia Medicaid program. O.C.G.A. § 49-4-142(a).

37.     More than 67 percent of Georgia's Medicaid expenditures are reimbursed with federal Medicaid funds.

38.     Georgia Medicaid beneficiaries' plans are administered directly by the State.

39.    Georgia Medicaid and all of its programs are governed by Georgia's medical assistance statute, O.C.G.A. § 49-4-140-58, and its implementing regulations, Ga. Comp. R. & Regs. § 350-1-.01 to § 350-7 (2021). The regulations provide that DCH "shall publish the terms and conditions for receipt of medical assistance in Policies and Procedures Manuals for each of the categories of service authorized under the State Plan." Ga. Comp. R. & Regs. § 350-1-.02(3) (2021). The State's medical assistance statute does not explicitly address, let alone exclude, coverage for transgender individuals seeking medical treatments for gender dysphoria.

40.    The DCH has promulgated a non-discrimination regulation, requiring that "no individual shall be excluded from participation, or be denied benefits, or be subjected to any other form of discrimination by the Department or providers of medical assistance, by reason of ... sex ...." Ga. Comp. R. & Regs. 350-1-.05.

## Georgia Medicaid's Categorical Exclusion of Gender-Confirming Surgery for Transgender Medicaid Beneficiaries

41.    Notwithstanding the federal Medicaid mandate that Georgia Medicaid provide health care to Georgia Medicaid beneficiaries, Defendants deny coverage for medically necessary gender-confirmation surgeries, based on the Exclusion in Georgia Medicaid's state plan.

42.     The Exclusion bars coverage for "[t]ranssexual surgery," an antiquated description of gender-confirming surgeries, which it mischaracterizes as "[e]xperimental or investigational" in nature. In line with the outdated terminology and beliefs about gender-confirming surgery, the Exclusion also states that gender-confirming surgery is "not generally recognized by … Medicare," among other entities, which is incorrect. *See* Georgia Medicaid Plan, HCFA-PM-91-4, Attachment 3.1-A at 1(c).

43.     Upon information and belief, procedures that are excluded as "[t]ranssexual surger[ies]" when provided for purposes of gender confirmation to treat gender dysphoria are covered when provided to treat other conditions.  For example, upon information and belief, Defendants will not cover an orchiectomy, the surgical removal of testicles, to treat a transgender woman's gender dysphoria but will cover that procedure to treat other conditions such as cancer. Similarly, upon information and belief, Defendants will not cover a hysterectomy to treat a transgender man's gender dysphoria but will cover this procedure to treat other conditions such as endometriosis.

44.     The Exclusion has been in effect continuously since January 1, 1993. *Id.*

45.     Georgia Medicaid's assertion that prescribing gender-confirming surgeries for transgender people diagnosed with gender dysphoria is "experimental or investigational" is medically unsupported and outdated.  As the HHS Departmental Appeals Board recognized, for several decades the medical and mental health professional communities have recognized, based upon peer-reviewed scientific literature, that gender-confirming surgical care and related services are safe and effective medical treatments for transgender individuals diagnosed with gender dysphoria.

46.     The WPATH Standards of Care recognize gender-confirming medical procedures and services as effective medical treatment for many transgender patients with gender dysphoria. Such treatment includes "[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring)." Because this care is based upon an individual's clinical condition, the WPATH Standards of Care set forth criteria to evaluate an individual for various gender-confirming surgeries.

47.     The broader medical community agrees that surgical interventions are safe and effective treatments for many transgender people with gender dysphoria. The American Medical Association, American Psychological Association, American Psychiatric Association, Endocrine Society, American College of

Obstetricians and Gynecologists, American Academy of Family Physicians, and other major medical organizations have recognized that gender-confirming surgeries are safe and effective treatments for gender dysphoria, and that access to such treatments improves the health and well-being of transgender people. Each of these groups has publicly opposed exclusions of insurance coverage by private and public health insurers, like the Exclusion at issue here.

48.    Defendants continue to maintain the Exclusion in Georgia's Medicaid plan. By doing so, they disregard the fact that the medical community recognizes gender-confirming surgical treatments as an effective means to treat gender dysphoria.  By continuing to enforce the Exclusion against transgender Medicaid recipients, defendants are unlawfully denying individuals diagnosed with gender dysphoria medical care prescribed by their treating health care providers.

### Plaintiff Delshone Thomas

49.    Ms. Thomas is 45 years old. She was born in Patterson, New Jersey, but has resided in Georgia for most of her life. Ms. Thomas is disabled and a beneficiary of Supplemental Security Income.

50.    Ms. Thomas is a woman.

51.    Ms. Thomas is transgender.

52.     Ms. Thomas was assigned male at birth, but her gender identity is female.

53.     Ms. Thomas has been aware of her gender identity since she was 7 years old. She has identified as female since then.

54.     Her family was not supportive of her transition initially and for much of her life she experienced a great deal of physical violence, verbal violence, and discrimination in all facets of life because of her gender identity.

55.     Ms. Thomas was formally diagnosed with gender dysphoria in or around 2014.

56.     She has been on hormone therapy consistently since 2014, which has been beneficial, but she continues to suffer from gender dysphoria. Ms. Thomas experiences anxiety and depression about having incorrect genitals, pain and discomfort from having to tuck her genitals to conceal them, and fears wearing certain clothing that may expose her transgender status because of a visible genital bulge.

57.     Ms. Thomas's mental health provider and primary care provider recommended gender-confirming surgeries to treat her gender dysphoria and wrote letters supporting surgery.

58.     On or around June 4, 2019, Ms. Thomas met with her surgeon and scheduled an orchiectomy to treat her gender dysphoria for July 1, 2019. Her surgeon submitted a prior authorization for Ms. Thomas's surgery to Georgia Medicaid.

59.     On or around June 26, 2019, Ms. Thomas was contacted by her surgeon's office and notified that Georgia Medicaid had denied prior authorization based on the Exclusion and that unless she could pay out-of-pocket, her surgery was canceled.

60.     Ms. Thomas cannot afford to pay for the surgery out-of-pocket, so she had to forgo medically necessary health care prescribed by her primary care provider and mental health care provider.

61.     Ms. Thomas's health care providers have also recommended vaginoplasty and mammoplasty to treat her gender dysphoria. Georgia Medicaid's denial of prior authorization for Ms. Thomas's orchiectomy, citing the Exclusion, makes clear that Georgia Medicaid will also deny Ms. Thomas coverage for vaginoplasty and mammoplasty based on the same policy. Therefore, Ms. Thomas has not sought prior authorization for vaginoplasty or mammoplasty because to do so would be futile.

62.    Through their acts and omissions described above, Defendants have injured and are continuing to injure Ms. Thomas by denying Georgia Medicaid coverage for medically necessary treatments because of the Exclusion.

63.    Defendants' promulgation and enforcement of the Exclusion, and Defendants' denial of Georgia Medicaid coverage for medically necessary care for Ms. Thomas pursuant to the Exclusion, have exacerbated Ms. Thomas's gender dysphoria, depression, and anxiety.

64.    Due to Defendants' enforcement of the Exclusion, Ms. Thomas also continues to suffer embarrassment, humiliation, social isolation, and stigma resulting from her inadequately treated gender dysphoria.  Ms. Thomas's inadequately treated dysphoria also causes her physical pain and injuries resulting from her practice of tucking.

65.    If Defendants continue to deny Georgia Medicaid coverage to Plaintiff for gender-confirming surgeries, the above-referenced harms to Ms. Thomas's physical and emotional well-being will continue.

**Plaintiff Gwendolyn Cheney**

66.    Ms. Cheney is 60 years old. She was born in Georgia and has resided in Georgia her entire life.

67.    Ms. Cheney is a woman.

68.    Ms. Cheney is transgender.

69.    Ms. Cheney was assigned male at birth but her gender identity is female.

70.    Ms. Cheney has been aware of her gender identity since she was 12 years old. She has identified as female since then.

71.    Her family was not supportive of her transition initially and like Ms. Thomas, she too experienced a great deal of physical violence, verbal violence, and discrimination in all facets of her life because of her transgender status.

72.    Ms. Cheney was formally diagnosed with gender dysphoria in or around 2014.

73.    She has been on hormone therapy, which has been beneficial but she continues to suffer from gender dysphoria. Ms. Cheney experiences depression and suicidal ideation because she looks in the mirror and does not see the woman she knows herself to be. These feelings have only intensified with age. Ms. Cheney has experienced physical pain and lacerations from tucking. Ms. Cheney is unable to wear certain clothing for fear of her transgender status being exposed by a visible genital bulge. Ms. Cheney has been negatively affected by strangers who perceive her as male because of her facial structure and her body. Ms. Cheney often refrains from leaving her home for fear of being harmed because of her appearance.

74.     Ms. Cheney is in need of mammoplasty, vaginoplasty, and facial gender confirmation surgery. Ms. Cheney's health care providers have documented that she meets the criteria for these gender-confirming surgeries.

75.     Because of the Exclusion, Ms. Cheney has been unable to find a Georgia Medicaid participating surgeon to consult with her.

76.     Ms. Cheney cannot afford to pay non-participating providers' consultation fees.

77.     Ms. Cheney has and continues to forgo surgical care to treat gender dysphoria because of the Exclusion.

78.      Defendants' promulgation and enforcement of the Exclusion, and Defendants' denial of Georgia Medicaid coverage for medically necessary care for Ms. Cheney pursuant to the Exclusion, have exacerbated Ms. Cheney's gender dysphoria, depression, and anxiety.

79.      Due to Defendants' enforcement of the Exclusion, Ms. Cheney also continues to suffer embarrassment, humiliation, social isolation, and stigma resulting from her inadequately treated gender dysphoria.  Ms. Cheney's inadequately treated dysphoria also causes her physical pain and injuries resulting from her practice of tucking.

80.    If Defendants continue to deny Georgia Medicaid coverage to Plaintiff for gender-confirming surgeries, the above-referenced harms to Ms. Cheney's physical and emotional well-being will continue.

## CLASS ACTION ALLEGATIONS

81.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring their claims for declaratory and injunctive relief as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2).

82.    Plaintiffs request that the Court certify the following class ("Proposed Class") under Fed. R. Civ. P. 23(b)(2), subject to amendment as appropriate:

> All transgender individuals with gender dysphoria who are or will be enrolled in Georgia Medicaid, and who have sought, or will seek, Medicaid coverage for gender-confirming surgeries (referred to in the Georgia Medicaid Exclusion as "[t]ranssexual surgery.").

83.    Plaintiffs Delshone Thomas and Gwendolyn Cheney are adequate representatives of the Proposed Class. They are both transgender individuals with gender dysphoria enrolled in Georgia Medicaid who are seeking, or intend to seek, gender-confirming surgeries, or "[t]ranssexual surgery," using the parlance of the Exclusion.

84.    The Proposed Class satisfies the requirements of Fed. R. Civ. P. 23(a)(1) because the class is so numerous that joinder of all members is impracticable. Upon information and belief, there are more than 40 individuals in

the Proposed Class. In addition, because of the transient nature of the Georgia

Medicaid population, in part because individuals' income may make them eligible

or ineligible for Medicaid at various points in their lives, it is impractical to join all

transgender individuals with gender dysphoria who may be denied coverage by

Georgia Medicaid under the Exclusion at some point.

85.     The Proposed Class satisfies the commonality requirements of Fed. R.

Civ. P. 23(a)(2) because there are questions of law and fact common to the class.

Pursuant to the Exclusion, Defendants have acted or refused to act on grounds

generally applicable to the Proposed Class. This action raises questions of law

common to all members of the Proposed Class, including (a) whether the

Exclusion, facially and as applied to members of the Proposed Class, violates the

Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution (b)

whether the Exclusion, facially and as applied to members of the Proposed Class,

violates the prohibitions on sex discrimination under Section 1557 of the Patient

Protection and Affordable Care Act; and (c) whether the Exclusion, facially and as

applied to members of the Proposed Class, violates the availability and

comparability provisions of the federal Medicaid Act.

86.     The Proposed Class satisfies the typicality requirements of Fed. R.

Civ. P. 23(a)(3) because the named Plaintiffs' claims are typical of the claims of

the Proposed Class. Ms. Thomas and Ms. Cheney are transgender individuals with gender dysphoria who are prevented from accessing medically recognized care based solely upon the Exclusion. Plaintiffs and members of the Proposed Class share the same legal claims under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Section 1557, and the Medicaid Act.

87.    The Proposed Class satisfies the adequacy requirements of Fed. R. Civ. P. 23(a)(4) because the class representatives will fairly and adequately represent the interests of the Proposed Class. The named Plaintiffs seek the same declaratory and injunctive relief as the other members of the Proposed Class: a declaratory judgment that the Exclusion violates the Equal Protection Clause, Section 1557, and the Medicaid Act, and injunctive relief enjoining Defendants from enforcing the Exclusion. The named Plaintiffs seek this relief to benefit themselves and to protect other transgender Georgia residents who are or will be enrolled in Georgia Medicaid. In asserting their own rights, the named Plaintiffs will vindicate the rights of all members of the Proposed Class fairly and adequately. The class representatives have no interests that are antagonistic to the interests of other members of the Proposed Class. The Proposed Class further satisfies the adequacy requirements of Fed. R. Civ. P. 23(a)(4) because counsel for the Proposed Class will fairly and adequately represent the interests of the

Proposed Class. The Proposed Class is represented by counsel from the American Civil Liberties Union Foundation, Inc. (ACLU), the American Civil Liberties Union of Georgia, Inc. (ACLU of Georgia), and King & Spalding LLP.  Each of these organizations has extensive federal court experience litigating on behalf of LGBTQ people, including regarding transgender people's access to health care, and has served as class counsel and putative class counsel in a number of LGBTQ-related cases.

88.     The Proposed Class satisfies the requirements of Rule 23(b)(2) because the Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

89.     A class action is superior to other available methods for fairly and efficiently adjudicating this litigation and protecting the rights of the named Plaintiff and the members of the Proposed Class.

## COUNT I

### *Violation of 42 U.S.C. § 1983 Based on the Deprivation of Plaintiffs' Rights Under the Equal Protection Clause of the Fourteenth Amendment*

### *Against Defendant Berry (for declaratory and injunctive relief for Plaintiffs and the Proposed Class)*

90.     Plaintiffs re-allege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

91.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

92.     Plaintiffs state this cause of action on behalf of themselves and on behalf of the members of the Proposed Class against Defendant Berry in his official capacity, for purposes of seeking declaratory and injunctive relief, and challenge Defendant Berry's enforcement of the discriminatory classification in the Exclusion both facially and as applied to Plaintiffs and the Proposed Class.

93.     Defendant Berry is a person acting under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs equal protection of the law. Through his duties and actions to direct, administer, and execute the Exclusion through the DCH, Defendant Berry has unlawfully discriminated—and continues to discriminate—against Plaintiffs and the Proposed Class based on sex-related considerations.

94.     The Exclusion discriminates, on its face and as applied to Plaintiffs and the Proposed Class, on the basis of sex, and on the basis of transgender status,

by prohibiting coverage for gender-confirming surgeries, referred to as "[t]ranssexual surgery".   Denying coverage for health care solely because it is for the purpose of gender transition is an exclusion based on a sex-related consideration.

95.    Moreover, gender transition as a treatment for gender dysphoria is a unique aspect of transgender status. Excluding coverage for health care services because they are for the purpose of gender transition is discrimination against transgender individuals as a class.

96.    In addition, under the Exclusion, transgender Medicaid participants whose health care providers have prescribed gender-confirming surgeries are denied coverage for necessary medical care, while other health plan participants will receive coverage for medically necessary surgeries including the same or similar surgeries as long as they are not provided for gender confirmation.

97.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex—which includes discrimination on the basis of sex characteristics, gender, gender identity, nonconformity with sex stereotypes, transgender status, and gender transition - is presumptively unconstitutional and subject to heightened scrutiny.

98.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is also presumptively unconstitutional and subject to strict, or at least heightened, scrutiny for the additional reason that such classifications are suspect, or at least quasi-suspect, because:

a.  Transgender people have suffered a long history of discrimination and continue to suffer such discrimination to this day.

b.  Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination.

c.  A person's transgender status bears no relation to a person's ability to contribute to society.

d.  Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

99.     Defendants' promulgation and continued enforcement of the Exclusion did not, and does not, serve even a legitimate state interest, let alone one

that is important or compelling. Nor is the Exclusion adequately tailored to any

such state interest. Rather, the Exclusion serves only to prevent Plaintiffs and the

Proposed Class suffering from gender dysphoria and in need of gender-confirming

surgical care from obtaining that care.

100.   Without injunctive relief from the Exclusion of coverage for gender-

confirming care, Plaintiffs and the Proposed Class will continue to suffer

irreparable harm in the future.

## COUNT TWO

*Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116*

*By Plaintiffs and the Proposed Class Against Defendant Georgia Department of Community Health and Frank W. Berry (for declaratory and injunctive relief for Plaintiffs and the Proposed Class)*

101.   Plaintiffs re-allege and incorporate each and every foregoing

allegation contained in paragraphs 1-89 of this Complaint, as though fully set forth

herein.

102.   Under Section 1557 of the Affordable Care Act, "an individual shall

not … be excluded from participation in, be denied the benefits of, or be subjected

to discrimination under, any health program or activity, any part of which is

receiving Federal financial assistance, including credits, subsidies, or contracts of

insurance, or under any program or activity that is administered by an Executive

Agency or any entity established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

103.   Upon information and belief, Defendant Georgia Department of Community Health receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.

104.   The Exclusion, on its face and as applied to Plaintiffs and the Proposed Class, violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

105.   Discrimination on the basis of sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557, as the Department of Health and Human Services recently confirmed.  *See* https://www.hhs.gov/about/news/2021/05/10/hhs-announces-prohibition-sex-discrimination-includes-discrimination-basis-sexual-orientation-gender-identity.html (last visited on May 18, 2021).

106.   By categorically excluding all coverage for gender-confirming surgeries, which the Exclusion refers to as "[t]ranssexual surgery," Defendant Georgia Department of Community Health has and continues to unlawfully

discriminate against Plaintiffs and the Proposed Class based on sex in violation of Section 1557.

107.   Plaintiffs and the Proposed Class have been and continue to be injured by Defendants' application of the Exclusion to deny them Georgia Medicaid coverage for gender-confirming surgical care, and have suffered injury as a result. By offering health care coverage to Plaintiffs and the Proposed Class that discriminates on the basis of sex, Defendant Georgia Department of Community Health has intentionally violated the ACA.

108.   Section 1557's prohibitions on sex discrimination are enforceable by Plaintiffs and the Proposed Class in a judicial action under 20 U.S.C. § 1683, which Section 1557 incorporates by reference. 42 U.S.C. § 18116(a).

109.   Without injunctive relief from the Exclusion of coverage for gender-confirming care, Plaintiffs and the Proposed Class will continue to suffer irreparable harm in the future.

## COUNT THREE

### Violation of the Medicaid Act's Availability Requirements, 42 U.S.C. § 1396a(a)(10)(A)

### By Plaintiffs and the Proposed Class Against Defendant Frank W. Berry (for declaratory and injunctive relief)

110.    Plaintiffs re-allege and incorporate by reference each and every foregoing allegation contained in paragraphs 1-89 of this Complaint.

111.    The Exclusion, and Defendant Berry's refusal based on the Exclusion to provide coverage for gender-confirming surgical care to Plaintiffs and the Proposed Class, denies coverage of medical assistance for gender dysphoria in violation of the Medicaid Act's availability requirement, 42 U.S.C. § 1396d(a)(10)(A), which mandates coverage for medically necessary services. The Medicaid Act availability requirement is enforceable by Plaintiffs and the Proposed Class under 42 U.S.C. § 1983.

112.    Without injunctive relief from the Exclusion of coverage for gender-confirming care, Plaintiffs and the Proposed Class will continue to suffer irreparable harm in the future.

## COUNT FOUR

### Violation of the Medicaid Act's Comparability Requirements, 42 U.S.C. § 1396a(a)(10)(B)

### By Plaintiffs and the Proposed Class Against Defendant Frank W. Berry (for declaratory and injunctive relief)

113.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1-89 of this Complaint.

114.   The Exclusion, and Defendant Berry's refusal based on the Exclusion, of coverage for gender-confirming surgery to treat Plaintiffs' and the Proposed Class's gender dysphoria, while covering the same or similar surgical procedures for other Georgia Medicaid beneficiaries with different diagnoses, violates Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), which mandates comparable medical assistance and which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

115.   Without injunctive relief from the Exclusion of coverage for gender-confirming care, Plaintiffs and the Proposed Class will continue to suffer irreparable harm in the future.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs and the Proposed Class respectfully requests that this Court:

A.     Certify a class of all transgender individuals with gender dysphoria who are or will be enrolled in Georgia Medicaid, and who have sought, or will seek, Medicaid coverage for gender-confirming surgeries (referred to in the Exclusion as "[t]ranssexual surgery") (the "Class");

B.     Name Delshone Thomas and Gwendolyn Cheney as representatives of the Class, and appoint Plaintiffs' counsel at ACLU, ACLU of Georgia, and King & Spalding LLP as Class counsel;

C.     On behalf of Plaintiffs and the Proposed Class, issue a permanent injunction enjoining any further enforcement or application of the Exclusion, and directing Defendants and their agents to provide Medicaid coverage to eligible enrollees for transition-related surgical care when medically appropriate without regard to the Exclusion;

D.     On behalf of Plaintiffs and the Proposed Class, issue a declaratory judgment that the Exclusion, facially and as applied to Plaintiffs and the Proposed Class:

1.     Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating on the basis of sex (which includes discrimination on the basis of sex characteristics, gender, gender identity, nonconformity with sex stereotypes, transgender status, and gender transition), and for being transgender;

2.     Violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating on the basis of sex (which includes discrimination on

the basis of sex characteristics, gender, gender identity, nonconformity

with sex stereotypes, transgender status, and gender transition);

3.      Violates the Medicaid Act's availability requirement, 42 U.S.C.

§ 1396a(a)(10)(A), by denying Plaintiffs and the Proposed Class

coverage for medically necessary care;

4.      Violates the Medicaid Act's comparability requirement, 42 U.S.C.

§ 1396a(a)(10)(B), by denying Plaintiffs and the Proposed Class

coverage for surgical procedures it covers for other Medicaid

recipients; and

E.      Award Plaintiffs reasonable attorneys' fees, costs, and expenses under

42 U.S.C. § 1988 or other applicable statutes; and

F.      Award such other and further relief as the Court may deem just and

proper.

Dated: June 24, 2021

Respectfully submitted,

By: */s/ Adam Reinke*

Sean J. Young
Georgia Bar No. 790399
Andres M. Lopez-Delgado
Georgia Bar No. 552876
AMERICAN CIVIL LIBERTIES
UNION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Phone: (678) 981-5295
syoung@acluga.org
adelgado@acluga.org


Taylor Brown*
Leslie Cooper*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7887
tbrown@aclu.org
lcooper@aclu.org

Adam Reinke
Georgia Bar No. 510426
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Phone: (404) 572-4600
Fax: (404) 572-5100
areinke@kslaw.com

Mark D. Polston*
Joshua C. Toll*
KING & SPALDING LLP
1790 Pennsylvania Ave., NW
2nd Floor
Washington, DC 20006
Phone: (202) 737-0500
Fax: (202) 626-3737
mpolston@kslaw.com
jtoll@kslaw.com

Brent P. Ray*
KING & SPALDING LLP
110 N. Wacker Drive
Suite 3800
Chicago, IL 60606
Phone: (312) 995-6333
Fax: (312) 995-6330
bray@kslaw.com

*Attorneys for Plaintiffs and the
Proposed Class*

* Motions for admission *pro hac vice* forthcoming